## Case No. 17,111.

### WALLIS v. THORNTON.

[2 Brock. 422.] [1]

Circuit Court, D. Virginia. May Term, 1831.

JUDICIAL SALES—SALE BY MARSHAL ON CREDIT—
TAKING BONDS—RIGHTS OF CREDITOR—
TRUSTS—EQUITY SUPERVISION.

1. Where a decree directs an officer of the court to sell property, "and bring the proceeds of sale into court," and the sale is on a credit of one, two, and three years, and bonds are given for the payment of the instalments, these bonds are the immediate proceeds of sale. As a matter of convenience, they may be permitted to remain in the hands of the officer, but as matter of strict right, the creditor may require that they shall be brought into court.

2. Where bonds are made payable to the marshal of a court, he has a right to collect them. In such case, the marshal must be considered as a trustee for the creditor. Quære, whether the direction to take bond implies, that it shall be taken to the marshal, rather than to the creditor? Where bonds are taken, not to the marshal and his successors, but to J. P., marshal, &c., his executors, administrators, and assigns, could his successor, in the event of the marshal being changed before the money is paid, act on these bonds without an assignment?

3. If bonds are made payable on or before the day mentioned in the condition, but the decree under which the sale is conducted, does not authorize the insertion of these words, it seems that the trustees have no right to receive the money before the day; if they had, the cestui que trust might be injured, without having an opportunity of providing for his safety. But, admitting that the trustees have a right to receive the money before it is due, they have no right to discount legal interest and receive only a part of the debt.

4. Courts of equity extend their control, not only over the acts of trustees, but over the acts of those who have any agency in enabling the trustees to violate their trust.

[Cited in brief in Keyser v. Hitz, 2 Mackey, 517.]

1 [Reported by John Brockenbrough, Esq.]

5. Where trustees sell on a credit, and receive the money before it is due, discounting legal interest, it does not operate, in equity, a discharge of the lien, but a court of chancery will consider the lien as still subsisting, and the purchaser as responsible to the creditor.

6. If, in the regular execution of a trust, money is paid to a trustee, his co-trustee is not liable for it, merely because he joined in the receipt; but if the trustee who received the money, had no right to receive it, his co-trustee who joins in the receipt, is considered as co-operating in a breach of trust, and will be involved in its consequences.

The plaintiff, George W. Wallis, filed his bill against the defendants, stating, that in a suit brought by the same plaintiff against the representatives of Samuel Adams, deceased, this court, in December, 1825, decreed, that unless the defendants, on or before the 15th day of January, 1826, paid $8017.26, with interest, to the plaintiff, the marshal should proceed to sell on a credit of twelve months, or such farther time as the plaintiff's counsel should direct, a tract of land, lying in Henrico, with directions to take bonds with approved security, and a deed of trust on the land. The marshal was directed to sell on a credit of one, two, and three years. Anthony R. Thornton, the deputy-marshal, on the 20th of May, 1826, sold the land to John Minor Botts for $2020, payable in three equal annual payments, to wit: in May, 1827, 1828, and 1829. The land was regularly conveyed under an order of court. The deed of trust was executed to the said Anthony R. Thornton and William Carter, trustees, to secure the payment of the purchase-money, as it should fall due, to John Pegram, the marshal. The plaintiff's counsel agreed to the substitution of other property, the deed for which was executed December 1st, 1826. The first instalment, which fell due in May, 1827, not being paid, the property was sold on the 26th of November, 1827, on the following terms: The amount of the first instalment to be paid immediately, the second in May, 1828, and the residue in May, 1829. Richard Anderson became the purchaser for $1848, to be paid and secured as before stated. On the 23d of January, 1828, Richard Anderson paid, not only the instalment, which was then due, but also those which were payable at a future time, the trustees discounting legal interest. The trustees, thereupon, executed their joint deed, and signed the following memorandum: "The payment for the within described lot of land, was made to us by Richard Anderson, in the following manner, on the 23d of January, 1828. Cash payment, due on the day of sale, November 26th, 1827, $757.46. Bond due on the 20th of May, 1828, $706.98; four months interest off, $14.14; $692.84; bond due May 20th, 1829, $383.56; sixteen months' interest off, $30.68; $352.88; $1803.18. Signed, Anthony R. Thornton and William Carter, Trustees." On the 26th of January, 1828, the said Anthony R. Thornton, accounted with the plaintiff's attorney, for $694.13, but has not accounted for the residue. The plaintiff was shortly after-

wards informed by Henry L. Carter, administrator of Anthony R. Thornton, of the payment by the purchaser, Richard Anderson, to his intestate, on the 23d of January, 1828. Neither the plaintiff, nor his attorney, or the marshal, ever consented to such payment. The plaintiff, in his bill, insists that by joining in the receipt, William Carter enabled Anthony R. Thornton to commit a breach of trust, and is responsible, whether any portion of the purchase-money paid by Anderson was received by him or not; that Richard Anderson paid in his own wrong, and is also responsible. The marshal, the administrator of Anthony R. Thornton and William Carter, the surviving trustee, and Richard Anderson, the purchaser, are made parties defendants. Henry L. Carter, administrator of Anthony R. Thornton, deceased, admits in his answer, that the whole money was paid to Anthony R. Thornton, who claimed the whole commission. There was no money in his hands at his death, except what stood to his credit in the bank of Virginia, $334.28. He died on the 6th of February, 1828.

Richard Anderson, the purchaser, insists on the right of the trustees to receive the money: That the credit was solely for the benefit of the purchaser, who might waive it. The only question respects the discount. Such would be the power of executors, and such is that of the trustees, who would receive the bonds and collect the money when due. Holding the bonds with the power to receive the money when due, necessarily implies a right to receive it at any time, and to surrender the bonds. This is still stronger than the common case, because the original decree directed the sale to be made by the marshal, and the money to be brought into court. Anthony R. Thornton and William Carter, made the sale, as deputies of the marshal (who had no personal agency in it), and took the deed of trust to themselves as trustees, to secure the payment of bonds, payable on or before a certain day. The sale at which this respondent purchased, was made for the payment of these bonds. The bonds which would have been required of him, had he not paid the money, would, probably, have been in the same form as to the trustees. In either case, the payment would have been legal, especially as the original decree directed the money to be brought into court. If, however, he should be held liable to the creditor, it must only be in the event of the insolvency of the trustees. He required a conveyance from both, and an acquittance from both, before payment. They stand equally bound to him, as the sureties against the claim of the creditor. He was not privy to the application of the money, to the use of either. William Carter says, in his answer: That he had no knowledge of the deed of trust, except that Anthony R. Thornton held it up, saying, "Here is a deed of trust, and I will make you a trustee," to which respondent assented. That this defendant did not attend the sale. That he admits the payment of the money to Anthony R. Thornton, and affirms that the respondent did not even

receive a commission. That he signed and acknowledged the receipt, without reading or inquiring about it, supposing that his signature was essential to the execution of the trust. That he was indebted to Anthony R. Thornton for his office, and it was understood, that he was to act under his instructions, and to pay over to him the money received. That he had the utmost confidence in Anthony R. Thornton, and believes that, had he lived, the affair would have been adjusted. That the money was received on the 23d of January; Anthony R. Thornton was taken sick on the 27th of January, and died on the 6th of February. William Carter contended, that as the bonds were payable to Pegram as marshal, his deputy had a right to collect them; his right being coextensive with that of his principal. Throughout the business, Anthony R. Thornton frequently acted as deputy marshal. The decree of December, 1825, directed the marshal to sell, and under that decree, Anthony R. Thornton sold. So on the execution of the second deed from John M. Botts, Anthony R. Thornton acted both as marshal and trustee. The deed required, that on default of payment, the trustees should sell on the request of the marshal. The property was sold, he believes, without directions from Pegram. Thornton having, as deputy, the whole authority of principal, ordered the sale, and sold as trustee. That this defendant does not know whether the bonds were made payable to the marshal, or the trustees. If to the trustees, Thornton had a right to receive the money; if to the marshal, the recourse of the plaintiff is against Anderson. The first deed of trust bears date, June 6th, 1826. It is made in trust, to sell on default of payment, at the request of Pegram, the marshal, in trust to pay the said Pegram, the sum or sums then due and unpaid, and the surplus, if any, the trustees are directed to retain in their hands, to be applied to the payment of bonds to become due. If, in the opinion of the trustees, a division of the property would be injurious, they are empowered to sell the whole for as much ready money as is due, and for the residue, on credits to meet the sums to become due; the property to remain bound in the hands of the purchaser, and the surplus of the purchase-money, if any, to be paid to John M. Botts. The second deed is dated December, 1826, substituting other property on precisely the same trusts. The third deed bears date, 26th of November, 1827, from Anthony R. Thornton and William Carter, the trustees, conveying the whole property to Richard Anderson, in consideration of the whole purchase-money, the receipt of which is acknowledged.

MARSHALL, Circuit Justice. This suit is brought by a creditor, claiming from the defendants a sum of money which this court has decreed to him, and which he has not received. In December, 1825, a decree was entered in his favour, against the original debt-

or, ordering a sale of lands which were subject to the debt, on a credit of one year, or on such farther credit as the plaintiff's attorney might direct, taking a bond or a deed of trust from the purchaser, to secure the payment of the purchase-money. The marshal, John Pegram, acting by Anthony R. Thornton, his deputy, made the sale and took the bonds to himself as marshal, and a deed of trust to Anthony R. Thornton and William Carter, who were his deputies, specifying the times of payment, and stipulating that, in case of default, the trustees or the survivor, or his heirs, should, at the request of the said John Pegram, his executors, administrators, or assigns, sell, according to the terms of the deed. Default having been made in paying the first instalment, a sale was made by the trustees, and Richard Anderson became the purchaser. He paid the whole purchase-money, including the two instalments not then due, discounting from the amount, the legal interest on that part of the debt which was not due. The money was received by Anthony R. Thornton, who died soon afterwards insolvent. His liability for the money not being questioned, a decree was entered against his representative at a former term, reserving to the plaintiff the right to proceed against the other defendants, as to whom the cause was continued. That decree having been unproductive, the plaintiff now asks a decree against the other defendants. Three persons are now before the court, the creditor, the purchaser, and the surviving trustee, on one of whom the loss sustained, in consequence of the default of Thornton, must fall.

The creditor has proceeded in a regular course of law, to obtain his money; has given no authority to any individual which the law does not give, and has committed not a single act of indiscretion or irregularity, that has been shown to the court. The extension of credit on which the sale was made, under his first decree, which has produced no loss, and the selection of trustees to whom the trust property should be conveyed, if he did select them, constitute his whole agency, except as a plaintiff prosecuting his suit in court. His selection of, or assent to, the trustees, gave them no power not expressed in the deed, and their actions can affect him no farther than they have acted by his authority. If, then, the creditor has lost his debt, he must have lost it by the mere operation of law, or by a correct exercise by the trustees, of the authority vested by him in them. If he has lost it by the operation of law, it must be because the money was paid according to the decree of the court. The decree orders the marshal to sell on a credit, "and to bring the proceeds of sale into court, to be disposed of by future order." Now, what are the proceeds of this sale? The decree directs that he shall "take bond with approved security, and deed of trust of the premises to secure payment of the purchase-money." These bonds are the

immediate proceeds of sale, and the decree directs that they shall be brought into court to be subject to its future order. This implies no right in the officer to make any disposition of them, either to the debtor himself, or to any other person. If the term "proceeds" be construed to apply to future, as well as immediate proceeds, to the money secured by the bonds, as well as the bonds themselves, this does not dispense with the necessity of bringing the bonds into court, or confer a right on the officer to exercise over them any of the rights of ownership. As a matter of convenience, they may be permitted to remain in the hands of the officer; but as a matter of strict right, the creditor might, I presume, have required that they should be brought into court.

It seems to be agreed, that the bonds being taken to the marshal, he had a right to collect them, which right might consequently be exercised by his deputies. I have felt some doubt on the propriety of making the bonds payable to the marshal. It is directed by no law. The decree does not specify the obligee, and I am not certain that the direction to take bond, implies that it shall be taken to the officer, rather than to the creditor. But passing over this difficulty, and supposing that, for the sake of convenience, there has been a general acquiescence under this practice, the marshal must be considered as a trustee for the creditor. He acquires no property in the bonds; no right of ownership over them; no power to dispose of them at his own will: he is a mere trustee. If empowered to collect them, he must collect them according to the trust. I do not mean to inquire, whether he exercises this trust by virtue of his office, or under an implied authority from the creditor. I am aware of the delicacy and consequences of this as a general question, and do not purpose to touch it; but will observe that these bonds are not taken to the marshal and his successors, but to John Pegram, marshal, &c., and to his executors, administrators, or assigns. Had the marshal been changed before the money was paid, could his successor, without an assignment, have acted on these bonds? However this may be, whether his trust was personal or official, it is a trust, and ought to be faithfully executed.

It is argued, that the bonds are payable on or before the day mentioned in the condition, and that a consequent right existed in the obligor to pay, and in the obligee to receive the money, immediately. The decree does not authorize the insertion of these words. The sale is to be made on credit, and bonds are to be taken for the payment of the purchase-money. It is the common formula, because an individual who is to receive money for himself, never objects to payment before the day. In trusts, it may be different. Payment before the day is never expected; and if it may be made without the knowledge of the cestui que trust, his situation may be chan-

ged, often to his very great injury, without enabling him to provide for his safety. But, admitting that the general direction to take bonds implies that they may be taken in the common form, and that this gives the debtor a right to pay before the day, it gives him a right to pay the whole debt, and the obligor a right to receive the whole debt, not a part of it. It gives no right to the one to purchase, nor to the other to sell the bonds for less than the sum mentioned in the condition. Such a transaction is not the exercise of any power conferred by the decree. If, then, this could be considered an an official act, it is an abuse of office; it is a wrongful act, and can confer no rights in equity on those who are parties to it. If the receipt of this money could be considered as an official act, the sureties of Thornton, if he gave any, would be responsible for it. I do not mean now to indicate any opinion on this question, if it be one, because I think General Pegram, whether officially or personally, was a trustee for the creditor, was known to all the parties as a trustee, and could not, by his own act, violate the trust for his own purposes. Consequently, that power could not be imparted to his deputies.

The creditor, then, has not lost his debt by the operation of law, and the responsibility of the parties before the court to him, is not changed by the circumstance that the trustees were also deputies of the marshal. They acted as trustees, the debtor contracted with them as trustees, purchased from them as trustees, and paid the money to them as trustees. The casual circumstance, that they were also the deputies of the marshal, can no more avail him, than them. I proceed, then, to consider the transaction as one between a debtor and trustees, respecting a trust debt.

I do not think the case at all varied by the fact, that the deed of trust and bonds upon the second sale, were not executed. It is fairly to be presumed, that those instruments, had they been executed if, indeed, a new deed of trust was required, would have conformed, precisely, to the deed of trust and bonds for which they were to be substituted.

The sale is made for the payment of a debt due to George W. Wallis. The terms are, partly for cash, and partly for credit. Bonds are directed to be taken for the payment of so much purchase-money as becomes due in future, secured by a deed of trust. The purchaser agrees with the trustees to pay the whole sum immediately, discounting legal interest, on which they convey the trust property, and give him a receipt in full for the purchase-money. Is this a fair, a legal, and an equitable execution of the trust?

Trustees must act conscientiously for the cestui que trust, and not for themselves. They have no right to divert the trust fund to their own use, and no man can relieve

himself of his liabilities by assisting in such conversion. Had the whole purchase-money been paid, without discount, to the person authorized to receive it, the case would have been involved in much difficulty. It might have been supposed that the terms of the bond, authorized the purchaser to pay before the day, and compelled the obligee to receive the money. Even, then, any co-operation between the parties for the sole benefit of the trustee, would not receive the countenance of a court of equity. But this payment is not made to the obligee; it is made to the trustee, whose right to receive it, depends on the deed of trust. We must refer to the deed, then, for his power and his duty. The deed does not authorize the trustees to sell under any circumstances, unless required to sell by Pegram. If required by him, they can only sell to raise so much of the purchase-money, as is then actually due, that is, so much as the obligee could recover by a suit at law. In one state of things only, can they sell the whole property, and that state of things, it is to be presumed, did actually occur. They did sell the whole property, but this right to sell, was not accompanied with the right to receive the purchase-money, which was to fall due in future. The language of the deed, after directing that the sale shall be for cash, so far as is necessary to pay the money actually due, is, "and as to the residue of the purchase-money, upon such credit as will meet the residue of the sum or sums to become due, the property to remain bound in the hands of the purchaser or purchasers, and to be sold, if he or they shall make default in the payment of any of the moneys that may thereafter be due and payable." The trust then requires, absolutely, that the property, if the whole be sold, shall remain bound in the hands of the purchaser for the money thereafter to become due. The trustees have a right to receive, only to the extent of the sale for cash; the property is to remain bound for the residue. They are empowered to receive that residue, only in the event of another sale for cash, which is not to be made until another instalment falls due, nor then, unless required by Pegram.

The terms of the trust, then, give no authority to the trustees to receive any part of the purchase-money, except that which arises from sales for cash; nor have they a right to make those sales unless required by the obligee. They are sedulously watched, and are not allowed to receive money, or to discharge the lien on the property, except at fixed times, when the fact of their receiving it must be known both to the obligee and to the creditor, and the attention of both must be drawn to it. They are not allowed to receive the money at a time when neither the obligee nor the creditor have any reason to suspect the fact, or any opportunity of providing for their safety. If the money was paid to trustees not authorized to receive, the liability, both of the purchaser, and of the trustees, to the creditor, cannot be controverted. But if the authority of the trustees to receive, could be identified with that of the obligee; if the money, by the terms of the trust deed, as by the terms of the bond, had been made payable on or before the time specified in the deed, let me inquire, whether a court of equity ought to consider this as a valid payment.

It will not be contended, that a trustee can rightfully receive money which is well secured, in order to apply it to his own purposes. He can have no right to vary and increase the risk of his cestui que trust, in order to benefit himself. Such acts are breaches of trust, and, even if within the letter of his power, are deemed void. In this case, the risk is varied and increased, without the knowledge or consent of the cestui que trust. A sum of money, which was amply secured, is collected by the trustee for his own use, and is held by him on his own personal security only. It is not collected for the cestui que trust, but for himself. Had he purposed to act for the cestui que trust, he would have consulted the interested party, or his counsel. But he acted notoriously for himself. This is undeniably a breach of trust. Courts of equity, in the exercise of that vigilance which they employ for the protection of trusts, extend their control, not only over the acts of trustees, but over the acts of those also, who participate in the transaction; who aid and assist in the violation of the trust; who enable the trustee to violate it. All are made responsible for the act. In Balfour v. Welland, 16 Ves. 156, the master of the rolls said: "Where the act is a breach of duty in the trustee, it is very fit that those who deal with him, should be affected by an act tending to defeat the trust of which they had notice.

It is a general rule, that where the trustee does not act in pursuance of his trust, but in violation of it, even if he is within the letter of his power, those who co-operate with him, in enabling him to defeat the trust, are responsible for it.[2] This case contains intrinsic evidence, that all the parties acted with full knowledge of the character of the transaction. The purchaser must have known, that Thornton intended the money for his own purposes. Receiving it on a discount of interest, was equivalent to borrowing it on interest. He could not have done this without intending to employ it.

The advance of money on a discount of legal interest, if to a person authorized to receive it, is, of itself, a perfectly fair, legal, and moral transaction. But, in regard to the power of these parties, it stands on the same ground with the discount of a larger sum. It is the

---

[2] Crane v. Drake, 2 Vern. 616; Scott v. Tyler, 2 Brown, Ch. 477; Andrew v. Wrigley, 4 Brown, Ch. 125–130; Hill v. Simpson, 7 Ves. 152; Lowther v. Lord Lowther, 13 Ves. 95; McLeod v. Drummond, 17 Ves. 169.

purchase of a bond by a debtor from a trustee, for less than the sum mentioned in the condition, attended by this additional circumstance, that the trust property is to be exonerated from the lien which insured the debt, and the only security substituted for it, is the personal responsibility of the trustees. Under such circumstances, a court of chancery must consider the lien as subsisting in equity, and the purchaser as responsible to the creditor.

In argument, the counsel for the purchaser has likened this case to a payment made to an executor before it became due. Had the money been payable to the trustees instead of the obligee, General Pegram, the cases would not, I think, stand on the same principles. An executor derives his power from the will, represents the testator in regard to the whole personal estate, and has an extensive discretion in its management. A trustee is strictly limited by the terms of the deed creating the trust, and has no power which it does not expressly give. But even in the case of an executor, the person who aids him in a breach of trust, does not act with impunity. The purchaser and co-trustee, have both aided in this breach of trust; the purchaser, by advancing the purchase-money; the co-trustee, by that act which induced him to advance it. It is not to be believed, that Anderson would have advanced the money to Thornton, had not Carter joined in the conveyance and receipt.

The counsel for Carter insists, that he is not responsible, as the whole money was paid to his co-trustee. Had it been received in the fair and regular execution of the trust, the person who received it would have been solely responsible. All the cases which bear upon the point, have been adduced; the subject has been profoundly examined at the bar, and they prove clearly that in a fair transaction, one trustee is not liable for money received by his co-trustee, merely because he joined in the receipt.

But although Carter's act implies nothing disreputable in intention, his entire confidence in his co-trustee has betrayed him into an indiscretion, which, in a court of equity, is considered as co-operating in a breach of trust, and involving him in its consequences. The effect of his joining in the conveyance and receipt, was the payment of the money. He believed it safe in the hands of Thornton, but the substitution of Thornton's responsibility for the security which the decree provided, was a breach which a court of equity cannot countenance. It is a wrongful act, and he must bear the loss resulting from it. I have never doubted the ultimate responsibility of both the purchaser and the co-trustee to the creditor. The only doubt which I have felt, regards the relation in which they stand to each other. Reflection has confirmed my first impression, that Carter, by signing the conveyance and receipt, has induced Anderson to pay the purchase-money, and has become surety for Thornton to him. I am therefore of opinion, that Carter is liable, in the first instance,

to the creditor, and that Anderson is liable, eventually, on the insufficiency of Carter to pay the debt.

Decree: The decree heretofore rendered against the administrator of Anthony R. Thornton, who was primarily chargeable with the plaintiff's demand, having proved unavailing, and the court being of opinion, that the payment by the defendant, Richard Anderson, of the deferred instalments of the purchase-money, discounting interest, and the execution of the deed to him by the trustees, were unauthorized transactions; and that these deferred payments still remain due, and are chargeable on the trust property, but that the defendant, William Carter, by uniting with the other trustee, Anthony R. Thornton, in giving a receipt for the money, and executing the deed, is bound to indemnify the said Anderson, for the payment made by him, and should, therefore, be first made liable to the plaintiff for the amount of the said deferred instalments, after deducting therefrom, so much of the trustees' commission on the sales, as remains unpaid;—the court therefore ordered and decreed, that William Carter should deposit in bank, to the credit of this cause, the deferred instalments, so far as they remained unsatisfied, with legal interest, from the dates at which they fell due respectively, and the plaintiff's costs. And the cause was retained in court, in order that the plaintiff might have a decree against the defendant, Anderson, and enforce his lien upon the trust property, if it should be necessary to the recovery of the money hereby decreed, or any part thereof.